525 A.2d 414

**MICHAEL T.L.**

v.

**MARILYN J.L., Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 18, 1986.

Filed April 27, 1987.

Timothy A. Finn, Beaver, for appellant.

J. Lauson Cashdollar, Beaver, for appellee.

Before BROSKY, DEL SOLE and JOHNSON, JJ.

JOHNSON, Judge:

This is an appeal by the mother from the following order of the Court of Common Pleas of Beaver County, dated June 9, 1986 which reads in pertinent part:

1. Custody of minor son, is hereby awarded to natural father as of noon on June 15, 1986.

A. Upon assuming custody of minor son, [ . . . ], under the terms of this Order, natural father, [ . . . ], and the boy shall reside with the paternal grandmother, [ . . . ], at her residence in Freedom, Pennsylvania, or at such other residence to which she may move throughout the balance of this calendar year and the first seven (7) months of 1987.

This case presents not only the difficult question of which parent should have the primary custody of the parties' minor child, but also the question of whether de facto custody of a child may be awarded to a non-party to the custody action. For the reasons set forth in our opinion, we hold such a determination by the court below to be error.

The parties were married March 23, 1979 and a son was born to them on October 12, 1979. After several temporary periods of living apart, the parties finally separated in November 1983. The father filed an action in divorce against his wife in April 1984; no decree was issued and the parties are still husband and wife. In June 1984, the father filed a petition for custody of the child averring that his son had resided with both parents until November 1983 and with the mother alone since that date. On July 24, 1984 after a conference before the Beaver County Child Custody Officer, a recommendation was issued to award custody to the mother with a partial custody award to the father. A court order to this effect was issued and docketed August 1, 1984 to be effective August 7, 1984. The mother retained custody of the child until, following evidentiary hearings, the court below issued an order granting custody to the father, provided that he reside with his own mother, the child's paternal grandmother, with partial custody to appellant. This appeal followed.

In custody cases the paramount concern of the court is the best interest of the child, including the child's physical, intellectual, emotional and spiritual well-being. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977).

This court's scope of review in custody cases has been stated by the Pennsylvania Supreme Court in *Spriggs v. Carson, supra*, where Mr. Justice Nix, now Chief Justice, stated for a plurality of the court:

> (O)ur law has long recognized that the scope of review of an appellate court reviewing a custody matter is of the broadest type ... Thus, an appellate court is not bound by deductions or inferences made by a trial court from the facts found; ... nor must a reviewing court accept a finding which has no competent evidence to support it ...

470 Pa. at 295, 368 A.2d at 637 (citations omitted).

The Pennsylvania Supreme Court more recently reiterated this standard in *Commonwealth ex rel. Robinson v. Robinson*, 505 Pa. 226, 478 A.2d 800, (1984) (plurality opinion):

> Thus an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support the trial court's factual conclusions, but may not interfere with those conclusions *unless they are unreasonable in light of the trial court's factual findings* [.] ... and, thus, represent a gross abuse of discretion ... (citations and footnote omitted; emphasis in original).

*Id.*, 505 Pa. at 237, 478 A.2d at 806.

We must first ascertain the hearing judge's findings of fact and whether those findings are supported by competent evidence. *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976). We must then determine whether the factual findings that are supported by the evidence in the record support the hearing court's ultimate conclusions. *Commonwealth ex rel. Robinson v. Robinson, supra*.

In this case, the hearing court based its decision to grant custody to the father on the mother's sexual promiscuity

and immoral conduct. Several years ago the courts in Pennsylvania, in making custody awards, were confronted with the dilemma of whether to permit greater tolerance of parents' nonmarital sexual relationships with persons of the opposite sex. The courts concluded that such nonmarital sexual relationships were relevant only if they could be shown to have an adverse effect on the child. *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. Myers v. Myers, supra; Brooks v. Brooks,* 319 Pa.Super. 268, 466 A.2d 152 (1983). Since no adverse effect was shown in this case, we must reverse.

■ At the outset, prior to the existence of a custody order, the parties who are parents stand on an equal footing and the only burden carried by either of them is to establish what is in the best interest of the child. *In re Custody of Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977); *Spriggs v. Carson, supra.*

To this end we will summarize the findings of· fact as determined by the hearing court (Opinion 6/9/86, at 2–4).

The child resided continually with the mother from birth. In July 1984, the mother had an abortion. She testified that her pregnancy in July 1984 resulted from sexual relations with her husband which frequently occurred subsequent to the parties' final separation in November 1983. These sexual encounters continued through May 1985. At the time of the final hearing, the mother was pregnant and was intending to carry the child to full term in August 1986. (The appellee herein is not the natural father responsible for the 1986 pregnancy.)

The lower court found that the mother had been sexually active with a number of men since the parties' separation. She maintained a clean house and prepared daily meals for her son. The mother was primarily responsible for the child's discipline and instruction. She spent considerable time with her son and did not leave him with babysitters for unreasonable amounts of time. The mother is presently seeing a man who is 65 years of age and who resides in

Pittsburgh. The court also found that the mother made marijuana cigarettes and smoked them in the presence of the child.

The lower court found the father had been through a 28–day in-patient drug and alcohol rehabilitation program in February 1985 and that he continued his drug use through June 1985 and his alcohol use through July 1985. The father resides with a current girlfriend in her apartment. Father owes over $2,000 in support arrearages to mother for his son. Father testified that if the lower court awarded him custody, he would move in with the paternal grandmother and she thereafter would have primary responsibility for the child's day-to-day care. After a long period of unemployment, father began working on January 8, 1986, at a local K–Mart.

The court found that since the paternal grandmother lived four blocks away from the mother, the child would remain in the same school where he attended kindergarten if he resided with his paternal grandmother.

The basis of the hearing judge's determination to change custody to the father on condition that he reside with the paternal grandmother may be distilled from the judge's commentary as follows:

... [T]he conduct of both parents has been deplorable.

The life of both Respondent/Mother and Petitioner/Father is presently in a state of flux. Even though separated since November 1983, they are still not divorced. In January 1986, Petitioner/Father obtained employment for the first time in several years. Additionally, he now appears to be emotionally involved with a [woman], who is currently separated from her husband but not divorced. Since separating from Petitioner in November 1983, Respondent/Mother has been sexually promiscuous; is currently pregnant and will give birth to her second child in August 1986 which, in and of itself, will necessitate considerable time, attention and energy on her part. Respondent/Mother's present companion is a [man] who is 65 years of age, and resides in the Pittsburgh area. This

necessitates traveling to and from Pittsburgh on a regular basis.

(Opinion 6/9/86 at 6).

It is clear that the hearing judge placed great emphasis on the mother's sexual history in making an award of custody to the father:

> During [the period subsequent to the parties' separation], Respondent/Mother made herself sexually available to just about every man who socialized with her and used drugs on a regular basis. In July 1984, Respondent/Mother had an abortion and she is presently pregnant and due to deliver in August 1986. Respondent/Mother presently sees a [man], 65 years of age, on a regular basis. He resides in Pittsburgh.

Opinion 6/9/86 at 5.

Combined with the allusions to being busy with a new baby and traveling to and from Pittsburgh, the court apparently deemed mother incapable of adequately caring for her son, despite her success to date. The hearing court indicated:

> It is also to be remembered that mere moral lapses are not sufficient to deprive a mother of her child, but where the immoral conduct is flagrant and persistent, it may not be disregarded by the trial court in considering the child's welfare and best interests. *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134 [360 A.2d 587] (1976). Although the issue in a child custody case between contending parents is how will the best interest and welfare of the child be promoted, the trial court, of necessity, must look at past conduct to determine probable future conduct of the contending parents.

Opinion 6/9/86 at 6.

In *Myers v. Myers,* our supreme court determined:

> It is now beyond dispute that the mere fact of a parent's nonmarital relationship is insufficient to deny him or her custody of the children.[3] Nevertheless, a parent's nonmarital relationships must be given close scrutiny in determining custody matters. The prevailing issue must

remain the best interests of the child, and a nonmarital relationship is merely one of the circumstances which the court must consider before reaching its decision.

[U]nless it can be shown that [the mother's] affair had a direct impact upon the children, or that she had neglected them, her indiscretions are at most factors to be considered.

[3] Indeed, such a rule could lead to absurd results. If both parents were shown to have had nonmarital affairs, both parents could be denied custody even if such a result would be clearly detrimental to the child's welfare.

*Myers,* 468 Pa. at 138, 360 A.2d at 589 (citations omitted).

In *Witmayer v. Witmayer,* 320 Pa.Super. 372, 467 A.2d 371 (1983), we held that with regard to a nonmarital relationship, the law does not presume that such a relationship will in and of itself have an adverse impact on a child. The negative effect must be established by competent evidence. *Id.* Without evidence of a harmful effect on the child, a parent's past conduct should have little weight in making a custody decision. *In Re Custody of Pearce,* 310 Pa.Super. 254, 259, 456 A.2d 597, 600 (1983); *Bresnock v. Bresnock,* 346 Pa.Super. 563, 500 A.2d 91 (1985). In *Burr v. Morgart,* 339 Pa.Super. 341, 345, 488 A.2d 1155, 1157, (1985) the Superior Court held that the mother's promiscuity "was not a factor requiring (consideration), for it did not have any adverse effect upon the welfare of the child. This (was) supported evidentially by the record and is a correct application of the law."

Custody cannot reasonably be granted on the basis of a parent's unsettled past unless the past behavior has an on-going negative effect on the child's welfare, *Brooks, supra.* Moreover, the ability to care for the child is to be determined as of the time of the custody hearing. *Bresnock v. Bresnock, supra.* In making its decision, the Trial Court must not dwell on matters buried in the past, but must concentrate only on those matters which affect the present and the future of the child. *Brooks, supra.*

Moreover, the holding in *In re Custody of Frank,* 283 Pa.Super. 229, 423 A.2d 1229 (1980) emphasizes that the

parents' relative abilities to care for a child should be judged as of the time of the custody hearing rather than as of an earlier time.

With the foregoing general framework for appellate review in hand, a look at the evidence developed at trial and an analysis of the specific issues raised on appeal is appropriate.

At the time the hearing concluded on March 13, 1986, father did not reside with the paternal grandmother, but rather with his girlfriend Jeannie. Jeannie is separated from her husband but not divorced and is the noncustodial parent of her own two children. Jeannie testified that Bobby repeatedly spent overnights at her apartment with the father, and on at least one occasion slept in the same bedroom as she and the father. (N.T. 1/6/86 at 112).

The father acknowledged his inability to care for his son on a day-to-day basis by testifying that if he was granted custody he would reside with his mother, the child's paternal grandmother, who would assume responsibility for the child.

Mother, on the other hand, had the acknowledged abilities and adequate facilities to continue to nurture the child's positive development. She was not encumbered by a "live-in" arrangement. She provided a clean, orderly house and always kept her son neat, clean and properly dressed. The child's in-chambers testimony confirmed that he and his mother resided with no one else. (N.T. 1/6/86 at 19); no one spent the night with his mother (N.T. 1/6/86 at 21); and that he had never seen his mother in bed with a man. (N.T. 1/6/86 at 28).

The mother testified to having an active sex life. She also testified that these activities only took place when her son was with his father on alternate weekends. (N.T. 1/6/86 at 38). The record viewed in its entirety contains countless sexual innuendos by the father and his witnesses concerning the mother's lifestyle but very little substance regarding the detriment to which the boy was subjected by his mother's social behavior.

The finding of the hearing court that the mother made and smoked marijuana cigarettes in the presence of the child is not supported by the record. The record merely supports a finding that, during the child's infancy, and while the parties still were residing together as husband and wife, both of them partook of marijuana smoking in the presence of the infant child (N.T. 2/13/86 at 184). Although there was evidence of continued marijuana use by the mother subsequent to the parties' separation (N.T. 2/13/86 at 184), there is no evidence to support the finding that it had occurred in the child's presence and the mother further testified that marijuana smoking is a practice that she has abandoned (N.T. 2/13/86 at 184).

The appellant presented testimony of her extended family regarding her parenting abilities as well as the testimony of a neighbor, M.R., a mother of four, who stated that the child was always neat, clean, well-mannered and polite and appropriately corrected by the mother when necessary. (N.T. 2/13/86 at 139–144). The trial judge found "that the minor son, is a well-mannered, well-behaved boy who loves both his mother and father" (Findings of Fact No. 18), and that he is "a well-mannered, well-behaved, mature for his age, six-year old" (Opinion 6/9/86 at 4).

In this case the trial court reached the following conclusion:

> At this time and for the immediate future, the best interest of minor son, [ ...], will not be promoted by awarding physical custody of the boy to Respondent/Mother nor will the boy's interest be promoted by awarding physical custody of [the child] to Petitioner/Father unless the paternal grandmother, [ ...], is involved with the boy on a regular week-to-week basis by requiring Petitioner/Father to reside with the boy at his mother's residence for at least a year. Opinion 6/9/86 at 7.

The court had previously determined that the paternal grandmother was to play a prominent role in the day-to-day rearing of the child. Opinion 6/9/86 at 6.

■ It is well-settled that natural parents in custody disputes are favored over third parties. *In Interest of James John M.*, 333 Pa.Super. 417, 422–24, 482 A.2d 637, 640 (1984). See also, *Commonwealth ex rel Zaffarano v. Genaro*, 500 Pa. 256, 455 A.2d 1180 (1983); *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980); *Commonwealth ex rel. Miller v. Miller*, 329 Pa.Super. 248, 478 A.2d 451 (1984); *Cady v. Weber*, 317 Pa.Super. 481, 464 A.2d 423 (1983), appeal decided, 322 Pa.Super. 550, 469 A.2d 1128 (1983); *Commonwealth ex rel. Strunk v. Cummins*, 258 Pa.Super. 326, 392 A.2d 817 (1978); *Commonwealth ex rel. Williams v. Miller*, 254 Pa.Super. 227, 385 A.2d 992 (1978); *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977). In the present case, the hearing judge's determinations were that the mother's "immoral conduct" precluded placement of the child with her, and father's inabilities to care for the child day-to-day precluded placement with him. So, the court conditioned the award to the father on the requirement that he abandon his apartment with his girlfriend and move in with the paternal grandmother for no less than fourteen (14) months, thereby assuring that the child would be cared for by the paternal grandmother.

■ In short, the paternal grandmother was favored over the mother to assume the primary parenting responsibilities. Going for the moment beyond the fact that the paternal grandmother is 65 years old, widowed, is employed and has been treated for twenty (20) years for depression for which she takes the medication Entrafon[1] daily, de facto primary parenting responsibilities have been awarded to a non-party. (T.R. 1/6/86 at 92, 95–96).

1. 41 Physicians Desk Reference 1810 (1987) states:
   Entrafon Tablets are indicated for the treatment of patients with moderate to severe anxiety and/or agitation and depressed mood; patients with depression in whom anxiety and/or agitation are moderate or severe; patients with anxiety and depression associated with chronic physical disease; patients in whom depression and anxiety cannot be clearly differentiated. Schizophrenic patients who have associated symptoms of depression should be considered for therapy with Entrafon.

We are also forced to comment on the fact that the paternal grandmother was less than candid in her testimony. She stated that she was not employed and had never been employed outside the home. (N.T. 1/6/86 at 92–93). Her son testified that she cleans offices for Burns Security. (N.T. 1/6/86 at 136).

As we held in *Moorman v. Tingle*, 320 Pa.Super. 348, 467 A.2d 359 (1983) aff'd without opinion, *Moorman v. Tingle*, 505 Pa. 513, 481 A.2d 854 (1984):

> ... [T]he parents have a "prima facie right to custody", which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*Id.*, 320 Pa.Super. at 352, 467 A.2d at 363. This prima facie directive has not been overcome. It is error which is compounded by the fact that the paternal grandmother is not a party to this action.

The trial court unduly emphasized the mother's prior conduct in the face of the acknowledged positive and healthy development of the child. The court's determination based upon its perception of the mother's "immoral conduct" is a gross abuse of discretion since the evidence does not reveal an adverse effect upon the child.

We have noted in the past:

> Everyone develops a code of personal conduct. It does not follow that one is entitled to impose that code on others, or penalize those who do not conform to it. Especially in a child custody case is it important that the hearing judge distinguish between his personal code of conduct, and his determination of what is in the children's best interest. One may believe, with the utmost convic-

tion, that certain conduct is wrong, and yet it may be that that belief should have little or no part in determining who should have custody of the children. A judge may believe that "lips that touch liquor shall never touch mine," but he is not for that reason to deny custody to a mother who drinks. A judge may be a devout church-goer, but he is not for that reason to deny custody to a mother who does not go to church. Or, as here, a judge may believe that it is immoral for an unmarried woman to have sexual intercourse, but he is not for that reason to deny her custody of her children.

*Robert H.H. v. May L.H.*, 293 Pa.Super. 431, 436, 439 A.2d 187, 190 (1981) quoting from *Commonwealth ex rel. Grimes v. Grimes*, 281 Pa.Super. 484, 498–499, 422 A.2d 572, 579, 580 (1980) (Spaeth, J., Dissenting Opinion).

We have also stated:

....The court must never assume, or infer, that simply because a nonmarital relationship exists, the impact of the relationship on the children has been harmful. The evidence must show that it has been harmful, and this is so whether the nonmarital relationship ... approaches a de facto marriage or, as in this case, is more transient.

*Robert H.H. v. May L.H.*, *supra* 293 Pa.Super. at 437, 439 A.2d at 190; *accord Haag v. Haag*, 336 Pa.Super. 491, 485 A.2d 1189, (1984).

In addition, we are also constrained to note:

*First.* This child has never lived in a household that did not include his mother. As we held in *Hartman v. Hartman*, 328 Pa.Super. 154, 476 A.2d 938 (1984):

This court has long recognized that the removal of a young child from his environment is a factor which bears on its emotional well-being.... Therefore, continued residence of children with one parent may be controlling.... Above the age of two, children become strongly attached to those who stand in a parental relationship and who have tenderly cared for them. Bonds of affection may

become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury.... [T]he fact that a stable, long-continued and happy relationship has developed between the child and one of the parents may be of critial importance to the formulation of an appropriate custody decree.

*Id.*, 378 Pa.Super. at 165-6, 476 A.2d at 943 (citations omitted).

*Second.* This mother was the primary caretaker who tenderly cared for her son with positive results. We have stated that:

When a child receives love, guidance, companionship, and direction from a parent on a consistent basis, a firm foundation is being laid for the child's future healthy development.... The need for a sense of continuity can, in certain cases, be controlling in the custodial decision.

*Gonzalez v. Gonzalez,* 337 Pa.Super. 1, 6-7, 486 A.2d 449, 452 (citations omitted). Therefore, our court continued:

(T)he trial court *must* give positive weight to the parent who has been the primary caregiver.... (emphasis in original.)

*Id.*, 337 Pa.Super. at 8, 486 A.2d at 453 (citation omitted).

We find the hearing judge's conclusion, that it is in the child's best interest that custody be awarded to appellee, is not based on competent evidence. We also find that appellee has not proven by a preponderance of the evidence that he is the superior parent. *Murphey v. Hatala,* 350 Pa.Super. 433, 504 A.2d 917 (1986). Accordingly, we hold that the lower court's inferences are not supported by the facts; thus, its decision to award custody of the child to appellee constitutes an abuse of discretion. Having determined, on the existing record, that the best interests of the child will be served by returning him to the custody of his mother, we reverse and remand to the trial court.

Order reversed and Case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.