J-S10002-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| NOAH J. MCELROY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ALYSSA B. STARTUP | : | |
| | : | |
| Appellant | : | No. 1686 MDA 2025 |
| | : | |

Appeal from the Order Entered November 5, 2025
In the Court of Common Pleas of York County Civil Division at No(s):
2022-FC-001630-03

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.:                    **FILED JUNE 11, 2026**

Alyssa B. Startup ("Mother") appeals from the November 5, 2025 order entered in the York County Court of Common Pleas that denied Mother's request for primary physical custody of then-five-year-old R.N.M-S. ("Child") during the school year and, instead, granted primary physical custody of Child to his father, Noah J. McElroy ("Father").  Upon review, we affirm.

The following factual and procedural history is relevant to this appeal. Mother and Father are the biological parents of Child.  The parties were once in a romantic relationship and lived together but have never been married. Father also has an older son from a previous marriage ("Half-brother").  The parties separated in March 2022 and Mother moved from York County, Pennsylvania, to Port Jervis, New York, which is approximately four hours away.

In August 2022, Father filed a custody complaint requesting shared legal and primary physical custody of then-two-year-old Child. On March 2, 2023, after a trial, the court awarded Father shared legal custody and shared physical custody of Child on week on/week off basis. The trial court noted that, due to the parties' distant proximity to each other, the court would have to grant primary physical custody to either Mother or Father once Child reached school age.

Mother is self-employed as an esthetician and lives alone with Child in a rental home. Father continues to reside in York County and is employed with the United States Army as a staff sergeant. In March 2023, Father married Melissa McElroy ("Stepmother"), who works remotely as a nurse for CVS Aetna. Father and Stepmother live together in a six-bedroom home with Stepmother's two daughters ("Stepsisters") during the week. Half-brother also lives with Father and Stepmother during the summer.

On March 19, 2025, Mother filed a petition to modify custody requesting primary physical custody of Child during the school year and averring, *inter alia*, that Child will turn five years old in March 2025 and will be eligible to enter kindergarten in either parties' jurisdiction during the next school year. In response, Father filed an answer and counter-petition to modify custody requesting primary physical custody of Child during the school year.

The trial court held a two-day custody trial in October 2025. Mother presented testimony from herself; Kenneth Startup, Mother's father; and Erin Kuttner, Mother's sister. Father presented testimony from himself;

- 2 -

Stepmother; Ashley Weber, Stepmother's mother; Joyce Weber, Stepmother's sister; Michaela Cumor, Stepmother's friend; and Melissa Pallares, Child's former nanny. The court also heard *in camera* testimony from Child.

In its Opinion in Support of Final Order of Custody, the trial court authored a thorough, accurate, and comprehensive summary of testimony which we adopt for purposes of this appeal. *See* Opinion, 11/5/25, at 1-14. In sum, Mother testified that she is self-employed as an esthetician in the Port Jervis tri-state area, earning approximately $35,000 the prior year with a projected increase to $55,000. She explained that she limits her work hours when Child is in her custody. She testified that she has a large extended family nearby, including her sister, father, grandparents, and cousins. Mother stated that she plans to enroll Child at Sussex Christian School, which is a private school in New Jersey that has a tuition cost of approximately $8,000 per year. Mother acknowledged that she has difficulty communicating with Father, and that they primarily communicate through Appclose. She testified that she would like to have primary physical custody of Child during the school year, with Father having partial custody every other weekend.

Ms. Kuttner, Mother's sister, testified that she is an elementary school teacher who is currently on maternity leave. She explained that she lives approximately 15 minutes away from Mother and watches Child several times a week. Ms. Kuttner testified that Mother is "engaged[,] supportive[,] loving[,and] playful" and that Child is academically advanced, despite not being enrolled in kindergarten. N.T. Trial, 10/27/25, at 22. She testified that

her brother has three kids and lives close by, and that the entire family gets together all the time.

Mr. Startup, maternal grandfather, testified that he assists Mother with Child two to three times per week. He described Mother and Child as having a great relationship and described Child as a "sweetheart." *Id.* at 35.

Stepmother testified that she works from home as a registered nurse with flexible hours. She testified that if Father receives primary custody, Child would attend Paradise Elementary public school in the Spring Grove school district. She testified that Child and Stepsisters have a sibling-like relationship and that she loves Child.

Father testified and described ongoing communication difficulties with Mother. He explained that he did not have access to Child's pediatric records due to the Port Jervis office having no patient portal and that he had difficulty getting school information from Sussex Christian Academy. Father explained that he is not in agreement with Child attending kindergarten at Sussex Christian academy due to his trouble communicating with the school and the cost of tuition. He testified that his immediate family is in Indiana, but that Stepmother has a large, engaged local family whom they see often. Father confirmed that he has occasional weekend work obligations but explained that he and Stepmother have never been required to work the same weekend. Father testified that he would like to have primary physical custody of Child during the school year.

Ms. Cumor, Stepmother's friend, testified that Father and Child both have a close relationship with Stepsisters and that Father is a good parent. Ms. Weber, Stepmother's sister, testified that Child and Stepsisters get along well and "love each other like siblings." *Id.* at 59. Ms. Weber, Stepmother's mother, testified that she visits Father and Stepmother's house several times per week. She explained that Father is a very loving and understanding parent and that Stepmother and Child have a very positive relationship. Ms. Pallares, Child's former nanny, testified that Father and Stepmother are great parents.

Child testified *in camera*. He testified that, if he had to choose, he would prefer to live with Father during the school year because he is able to play with LEGOs and use his computer tablet at Father's house.

At the conclusion of the trial, the court considered the 23 Pa.C.S. § 5328 custody factors and awarded primary physical custody of Child to Father. Specifically, the court awarded shared legal custody to both parties; primary physical custody to Father and partial physical custody on alternating weekends to Mother during the school year; primary physical custody to Mother on a two-week on/one-week off basis during the summer months.

Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues for our review:

1. The trial court erred as a matter of law in applying its finding that "[F]ather's employment situation and financial situation to be more stable" as determinative to its decision when the record is devoid of evidence that [M]other was unable to

provide adequate housing, nutrition, healthcare, or educational continuity for [C]hild.

2. The trial court erred as a matter of law by implicating [M]other's relative financial ability it its finding that "[M]other's plan for education for the child is less sustainable than [F]ather's plan for education for the child."

3. The trial court erred as a matter of law in equating [C]hild's relationship with [Stepsisters] and [H]alf-brother in fashioning an [o]rder which minimizes time with his half-brother and maximizes time with his stepsiblings.

4. The trial court erred as a matter of law by entering an order which fails to maximize time between [C]hild and [H]alf-brother when it was undisputed that [H]alf-brother spends his entire summer and school breaks with [F]ather.

5. The trial court erred as a matter of law in failing to properly consider the availability of the parties' respective extended families, and [C]hild's relationship (or lack thereof) with each party's extended family.

6. The trial court erred as a matter of law in failing to properly consider that [C]hild's medical needs have been primarily if not solely attended to by [M]other in New York State where she resides.

7. As a result of the above errors, the trial court erred in fashioning its final [c]ustody [o]rder by awarding [F]ather majority physical custody

Mother's Br. at 5-6 (reordered for ease of disposition).

This Court reviews a custody determination for an abuse of discretion, and our scope of review is broad. *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014). This Court will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016). This Court must accept the findings of the trial court that the evidence supports. *S.W.D.*, 96 A.3d at 400.

- 6 -

Importantly, "[o]n issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." *K.T. v. L.S.*, 118 A.3d 1136, 1159 (Pa. Super. 2015) (citation omitted). We can interfere only where the "custody order is manifestly unreasonable as shown by the evidence of record." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted). Further, in a custody case, relief is not warranted unless the party claiming error suffered prejudice from the mistake. *J.C. v. K.C.*, 179 A.3d 1124, 1129-30 (Pa. Super. 2018).

Pennsylvania law provides that the trial court is only empowered to change an existing custody order if the modification will "serve the best interest of the child." 23 Pa.C.S. § 5338(a). Indeed, when reviewing child custody matters, our "paramount concern and the polestar of our analysis" is the best interests of the child. *Saintz*, 902 A.2d at 512 (citation omitted). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *D.K.D. v. A.L.C.*, 141 A.3d 566, 572 (Pa. Super. 2016) (citations omitted). "Common sense dictates that trial courts should strive, all other things being equal, to assure that a child maintains a healthy relationship with both of his or her parents, and that the parents work together to raise their child." *S.C.B. v. J.S.B.*, 218 A.3d 905, 916 (Pa. Super. 2019).

The trial court "shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors . . . which affect the safety of the child," including the factors mandated by the Custody Act. 23 Pa.C.S. § 5328(a). The court must "delineate the reasons for its decision[.]" *Id.* at § 5323(d). Finally, in any action regarding the custody of the child between the parents of the child, there shall be no presumption that custody should be awarded to a particular parent and no preference based upon gender. *Id.* at §§ 5327(a) and 5328(b).

Here, the court analyzed the Section 5328 custody factors and found them all to be neutral with the exception of factor 6, sibling and other familial relationships, and factor 7, the child's preference, which the court concluded favored Father. Trial Ct. Op., 11/5/25, at 15-19. The court found that child has "meaningful relationships" with Stepsisters as well as Half-brother. *Id.* at 17. The court recognized that Child stated a preference to live with Father during the school year, but found that Child's preference lacked a "meaningful basis." *Id.* The court also emphasized that "the parties reside three hours and 40 minutes from each other. Given the distance, it is not practical at this point in time to maintain an equally shared physical custody arrangement during the school year." *Id.* The court found that "both parents are fit parents" but "not[ed] of import" Father's stable employment and finances, Father's plans for Child's education, and Child's sibling relationships when awarding Father primary physical custody of Child during the school year. *Id.* at 19-20.

In Mother's first two claims of error, she avers that the trial court erred when it engaged in an analysis of the parties' relative economic circumstances in making its custody determination. Mother's Br. at 11, 16, 30. Mother argues that the trial court impermissibly placed weight on Father's stable employment and finances as well as Father's education plan for public school which, in contrast to Mother's plan for private school, does not involve a tuition payment. *Id.* Mother argues that the trial court's finding that Father's education plan is "more sustainable" implies that Mother is not going to be able to afford tuition. *Id.* at 30. Mother further argues that this is "in contravention of long-standing case law forbidding a relative comparison of parties' respective financial conditions." *Id.* at 11. Upon review, we discern no error.

We agree that "the law in Pennsylvania has long been that custody is not to be awarded merely on the basis that . . . a higher standard of living can be provided elsewhere." *Roadcap v. Roadcap*, 778 A.2d 687, 690 (Pa. Super. 2001) (citation and internal quotation marks omitted). "Indeed, in a custody proceeding, the sole permissible inquiry into the relative wealth of the parties is whether either party is unable to provide adequately for the child; unless the income of one party is so inadequate as to preclude raising the children in a decent manner, the matter of relative income is irrelevant." *Id.* (citation and internal quotation marks omitted).

Here, the court did not base its custody determination solely on the parties' relative economic circumstances. On the contrary, the court found

that "both parties are fit parents who provide for Child's needs adequately." Trial Ct. Op., 12/18/25, at 2. The trial court explained that in placing weight on Father's employment and finances, it focused on stability rather than economic circumstances. The court considered the fact that Mother is self-employed, does not have stable hours, and does not have someone living in her home that "can provide immediate support" and, in contrast, Father is employed by the United States Army, has stable work hours, and is married. *Id.* While the court did consider Father's employment and financial stability, the court did not directly compare Father and Mother's economic circumstances to make a custody determination. *Id.* As stated above, the court placed weight on Father's stability, Father's education plan, and Child's sibling relationships in making its custody determination and did not rely solely on the parties' finances. Thus, because the trial court did not base its custody determination solely on the parties' relative economic circumstances, we conclude that the trial court did not abuse its discretion.

Likewise, we discern no abuse of discretion in the court placing weight on Father's education plan. In its Opinion in Support of Final Order of Custody, the court found that Father's education plan for public school was more "sustainable" than Mother's plan for private school. Trial Ct. Op., 11/5/25, at 20. While Mother argues that this "directly implicates a comparison of the parties' respective financial circumstances," Mother is unable to cite where in the record the trial court made this comparison. Mother's Br. at 30. Mother further argues that "there is no basis for the court's conclusion that she would

be unable to sustain the private school tuition" but, likewise, fails to cite where the trial court made this finding. *Id.* at 32. Mother's unsupported characterizations of the trial court's findings are insufficient to warrant appellate relief.

In issues 3 and 4, Mother avers that the trial court erred when it fashioned a custody order for Child that minimizes his time with Half-brother while maximizing his time with Stepsisters. *Id.* at 5. Mother asserts that Father only has partial custody of Half-brother, who lives in Indiana, for six weeks in the summer, from June to mid-July. Mother contends that the "net effect of the order is that [C]hild will see [H]alf-brother for, at the most, two weeks during the summer and at Christmas." *Id.* at 25. Mother argues that the court erred when it prioritized Child's relationship with Stepsisters over his relationship with Half-brother. *Id.* Mother's argument lacks merit.

It is well-settled that "the policy in Pennsylvania is to permit siblings to be raised together, whenever possible[.]" ***Johns v. Cioci***, 865 A.2d 931, 942 (Pa. Super. 2004). "Absent compelling reasons to separate siblings, they should be reared in the same household to permit the continuity and stability necessary for a young child's development." *Id.* (citation and internal quotation marks omitted). Notably, "[t]his policy does not distinguish between half-siblings and siblings who share both biological parents." *Id.*

Here, the court fashioned a custody award that would maximize Child's time with Half-brother as well as Stepsisters. The court considered the fact

that, during the school year, Stepsisters spend four weekends out of every month with their biological father. The court opined:

> [Mother]'s suggestion that [Father] receive custody solely during weekends and some holidays during the school year would utterly deprive Child of any meaningful sibling-like contact with [Stepsisters]. Given this, as well as the fact that Child would not be spending significantly more time [with] [H]alf-brother, an extra one-third (1/3) of his summer vacation, and that [Mother] has no custody or other sibling-like relationships in her proximity, this factor favored [Father] in making this [c]ourt's custody arrangement.

Trial Ct. Op., 12/18/25, at 4. As the court fashioned a custody award that would maximize time with all of Child's siblings, we discern no error. Moreover, while Mother argues that stepsiblings and half-siblings should receive different considerations under the Custody Act, she fails to provide any legal authority to support this proposition. Accordingly, this issue lacks merit.

Mother's remaining issues all raise challenges to the weight of the evidence and fail to garner relief. In accordance with our well settled standard of review, we defer to the trial court on issues of weight and credibility. The trial court has authored a comprehensive, thorough, and well-reasoned opinion, including a summary of testimony, and has engaged in an analysis of each of the Section 5328 custody factors and made specific findings regarding each factor, which the record supports. After a thorough review of the parties' briefs, the applicable law, and the trial court's Opinion in Support of Final Custody Order, we conclude that there is no merit to the remaining issues that Mother has raised on appeal and, thus, discern no abuse of discretion.

- 12 -

Accordingly, we adopt the trial court's analysis as our own and affirm on the basis of the trial court's November 5, 2025 opinion. See Trial Ct. Op., 11/5/25, at 1-21 (relaying the relevant factual and procedural history, providing an accurate summary of the evidence, considering the Section 5328 custody factors, and finding that it was in Child's best interest to award Father primary physical custody of Child during the school year).

In sum, the trial court did not err when it entered the November 5, 2025 custody order after considering the Section 5328 custody factors. The trial court did not err when it placed weight on Father's employment and financial stability, Father's education plan, and Child's relationship with his siblings. Moreover, Mother's challenges to the weight of the evidence fail to garner her relief. The record supports the trial court's findings and, therefore, we discern no abuse of discretion.

All parties are instructed to attach a redacted copy of the November 5, 2025 opinion to all future filings.

Order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/11/2026

- 13 -

York County Prothonotary E-Filed - 05 Nov 2025 01:34:14 PM
Case Number: 2022-FC-001630-03

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA

NOAH MCELROY         :    No. 2022-FC-001630-03
                     :
    VS               :
                     :
ALYSSA STARTUP       :


York, Pa., Thursday, October 30, 2025

Before the Honorable MICHAEL W. FLANNELLY, Judge


APPEARANCES:

        KATHRYN NONAS-HUNTER, Esquire
        For the Plaintiff

        ANDREW B. BROWN, Esquire
        For the Defendant

\* \* \*

OPINION IN SUPPORT OF FINAL ORDER OF CUSTODY

The custody trial in the above-captioned matter was conducted before this Court on October 22nd, 2025 and October 27th, 2025. The matter before this Court was the result of a Petition for Modification filed by Alyssa B. Startup (hereinafter "Mother"), and

1

the Counterpetition for Modification filed by Noah J. McElroy (hereinafter "Father").

Mother and Father were both represented by counsel. Mother and Father are the biological parents of ████████ (hereinafter "Child").

The first witness in the case was Mother. Mother is 31 years of age and resides in the State of New York. The area of New York involved is basically where the states of New Jersey, Pennsylvania, and New York meet. Mother is self-employed as an esthetician. She also indicated that she does tattoos for women who had mastectomies.

Mother indicated that she works more hours when Father has custody of the Child. If Child is with her, she works approximately six to eight hours. Mother stated that if she was to have primary custody of Child during the school year, she would be able to work more hours during the time in which school is in session. Mother indicated that she had an income of $35,000 last year but projects an income of $55,000 in the coming year. Mother pays $1,350 a month in rent as well as $520 a month in a car payment.

2

Mother stated that if she requires assistance with childcare, she can rely upon her sister Erin Kuttner, as well as her father, Kenneth Startup (hereinafter "Maternal Grandfather.")

Mother stated that she has a large extended family located in the tri-state area. She has her own grandparents who live nearby as well as a number of cousins who live nearby. The Child has frequent interactions with her family. They get together regularly for play dates, church, and family gatherings. Mother noted that she is able to rearrange her schedule if there's an emergency concerning Child.

Mother testified the Child does not have any difficult special needs. The Child has a pediatrician in Port Jervis, New York. The pediatrician does not have a patient portal. The Child has had some issues with flatfeet. The child, therefore, has a podiatrist who followed him for a period of time. Child also did have a problem with one of his eyes. That problem has been corrected as of now.

Mother claimed that Father is notified of appointments, although she did concede that there was one appointment where Father did not receive

3

notification. Father has participated in person a couple of times and has appeared by remote technology at other times.

Mother resides in a rental home. It's just her and Child at the current time in the rental home.

Mother would intend to send Child to Sussex Christian School which is located about 22 minutes away in New Jersey. The Child attended preschool at this location. It would be Mother's intent to send Child there for kindergarten. Mother noted that there would be tuition that would have to be paid in order for Child to attend preschool or kindergarten at Sussex Christian School. Mother testified that she would be able to afford the tuition.

Mother testified that she and Child attend Echo Grace Church which is about eight minutes away. She noted that her family all attend and are active in the church. Mother has attended the church since she was 15 years old.

Mother indicated that she and Father have difficulties in communicating. Mother believes that Father's communication is generally hostile in nature.

4

Their communication is largely through AppClose. There's very little verbal communication.

Mother testified that she is a very present parent who is active in their Child's life. She believes Child is very strongly bonded with her. Mother did note it is an issue that she is a single mom and does not have somebody in the household who can provide immediate support.

Mother noted that there was an alleged incident back in July of 2024. Mother made a referral to Children, Youth & Families concerning alleged inappropriate touching by Father's son, Kellan, who is either seven or eight years old. Kellan resides most of the time in Indiana, but was home during the summer when the alleged incident in question supposedly occurred. Children, Youth & Families did not make an indicated finding of abuse concerning the allegation of inappropriate sexual touching.

Mother then discussed an incident which took place at an exchange in Allentown in September of 2024. Mother testified that Stepmother called her a narcissist in a loud enough voice that Child could hear it. Mother testified that Stepmother also said that

5

Mother was unstable and was a threat to Child's mental health. Mother noted that she has no other children at this time.

The parties reside approximately three hours and 40 minutes apart from each other. Their exchanges are in Allentown which is approximately halfway between the two parties.

Mother then referred to a situation in which Stepmother got pregnant. Child revealed Stepmother's pregnancy to Mother. Mother then took active steps to prepare Child for being a big brother. As it turns out, the pregnancy was for surrogacy purposes only. Mother complained that this information should have been provided to her so that she could appropriately discuss these things with Child as opposed to preparing Child to being a big brother.

Mother testified that she would prefer to have the Child with her during the school year with Father getting the child every other weekend. She was fine with Father getting long weekends during the school year. She indicated that the Friday exchange could take place somewhere around 4 o'clock p.m. and then the Sunday exchange would take place at 6:00 p.m. Mother is

6

in favor of the week on/week off schedule during the summertime.

On cross-examination, Mother testified that the tuition for Sussex Christian Academy would be $8,000 per year as of now, but would be more in the future. Mother testified that she's currently involved in a romantic relationship but has not introduced this person to Child as of yet.

Father filed a petition to have Child's name changed to include his last name in a hyphenated situation. Mother objected to the name change.

The Court then interviewed the Child on the start of the second day of trial. The Child expressed a preference to be with Father during the school year. When pressed about the basis for his preference, the Child says he gets to play with his tablet and Legos at Father's house.

The Court then took testimony from Erin Kuttner by Zoom technology. Ms. Kuttner is Mother's sister. She resides approximately 15 minutes from Mother. Ms. Kuttner is an elementary school teacher who is currently on maternity leave. She has a four-month-old girl. Ms. Kuttner testified that she

7

sees Mother routinely and that the family gets together for many events. She noted that she and Mother have a brother by the name of Brandon who resides in Milford, Pennsylvania which is a short distance from Mother's residence. Brandon has three children of his own.

Ms. Kuttner testified that Mother is a very present and engaged parent. She noted that Mother is playful, loving, fair, and consistent as a parent. Ms. Kuttner watches Child one to three times a week for one to three-hour stretches. Ms. Kuttner testified that Child is doing well academically despite not being enrolled in kindergarten. She testified that Child is actually advanced beyond the average kid in one of her kindergarten classes, and is approximately at the same level socially and emotionally as the children in her classroom.

The next witness in the case was Maternal Grandfather. Maternal Grandfather is retired from his primary occupation but does work part-time on some weekends. He helps Mother with Child two to three times a week. He observes that Mother and Child have a "sweet relationship". He noted that Child is well behaved and generally listens to Mother.

8

The next witness in the case was Michaela Cumor. Ms. Cumor testified by Zoom technology. She was a witness for Father. She testified that she has been friends with Stepmother for some time. Ms. Cumor has a daughter who is the same approximate age as Stepmother's older daughter. The two daughters play Lacrosse together, and as a result, they spend a fair amount of time with each other. Ms. Cumor was present during a phone call in March of 2024. Child was at Mother's residence and was having a scheduled call with Father. Because the call was on speaker phone, Ms. Cumor was able to hear Mother. Mother complained about Stepmother's children playing Roblox. Ms. Cumor testified that Mother accused Stepmother of being a bad mother for permitting her daughters to play Roblox. Ms. Cumor further testified that Father has a close relationship with Stepmother's daughters and that Father is a good parent to Child.

The next witness in the case was Ashley Weber. Ms. Weber is Stepmother's sister. She resides about 12 minutes away from Stepmother's house. She testified that she personally has a good relationship with Child. Ms. Weber has two daughters who play with

9

the Child and they are within the same age range as Child. She further noted that Child's relationship with his stepsisters is very positive. She further testified that she has no concerns about Father's son Kellan.

The next witness in the case was Joyce Weber. Ms. Weber is Stepmother's mother. She is at Father and Stepmother's residence two to three times a week from between one to two hours. She works from 8:30 a.m. to 5:00 p.m. She has known Father for three to four years. She testified that she has a wonderful relationship with Child and that the Child has a very positive relationship with his stepsisters. Ms. Weber further testified that Father has a very positive relationship with Child and that he is a very understanding parent. She also noted that Stepmother and Child have a very positive relationship.

The next witness in the case was Melissa McElroy (hereinafter "Stepmother"). She noted that her relationship with Father started in April of 2022. They began living together in September of 2022. She testified that she has a daughter Mila and a daughter Ava. Mila attends Spring Grove Intermediate School and Ava attends Paradise Elementary. She noted that Child

10

would go to Paradise Elementary if Father was to get majority physical custody during the course of the school year. She noted that Father works with Child concerning his education. He uses a learning app as well as workbooks. The Child was involved in Commonwealth Connections for educational purposes prior to this year.

Stepmother testified that Child and her two daughters have a sibling relationship. She also noted that Child was very close to her daughter Mila. Stepmother is a registered nurse who is employed by CVS Aetna. Stepmother works from home. Her general hours are from 8:00 a.m. to 4:30 p.m. but she noted her hours can be flexed, if necessary. Father is employed by the United States Army at Fort Indiantown Gap. Father leaves the house early so Stepmother is the one who puts the children on the bus. She testified that there is real no need for daycare for her daughters. Father is generally home from work by the time that her children return from school.

She noted that she and Father reside in a large single family home that has six bedrooms. Each child is able to have their own room. The Child and

11

Kellan used to be in the same room. Stepmother testified that there was a baby monitor in that room so that Father and Stepmother could monitor what was going on in the room. Stepmother testified that the Children, Youth & Family investigation turned up no finding of abuse.

Stepmother complained that Mother routinely interjects herself in calls between Father and Child. Stepmother presented a very different version of events from concerning the incident at the custody exchange. Her testimony was that Mother called Stepmother a "bitch."

The Court interrupted Stepmother's testimony to take the testimony of Melissa Pallares. Ms. Pallares is employed by the Westminster Police Department. Ms. Pallares testified that she has known Stepmother for awhile now. Ms. Pallares provided daycare for Child in 2023 prior to her becoming a police officer. Ms. Pallares testified that Stepmother and Father are great parents who are very active in the education of their children.

On cross-examination, Stepmother testified that her daughters' father resides in Denver,

Pennsylvania. Her daughters' father sees the girls four weekends a month during the school year.

The next witness in the case was Father. Father testified that his proposed schedule would be for him to have majority physical custody during the school year. With regards to summer, Father indicated he would be agreeable to Mother having two weeks with Child, followed by Father having one week with Child on a continuing basis.

Father noted that he and Mother have difficulty in communicating on a fairly frequent basis. He did note they are able to resolve things concerning certain issues fairly well. Father testified that communication was particularly difficult in the first year following the last custody order in this case. Father complained that Mother would use abusive language in her AppClose communications to him. Father did later concede that the harshness of these communications became less and less over time. Father complained that he had difficulty getting information from the pediatrician in Port Jervis, New York. Father noted that it is a small office that does not have a patient portal. Father also complained that he had difficulty

13

getting information from Sussex Christian Academy.

Father also noted that Mother objected to his request that Child have a hyphenated name which would include his last name as well as Mother's last name. The hearing before Judge Matthew Menges was conducted in December of 2023. Judge Menges did grant Father's request.

Father does not have any immediate family located in the York County area. His family is largely located in Indiana. He did note that Stepmother has a large and engaged family in the York County area.

Father testified that he is required to work an occasional Saturday. Stepmother is also required to work an occasional weekend. Both he and Stepmother have not been required to work on the same weekend. He noted that if they are required to work on a weekend, they can flex their schedule to take time off during the week.

Following Father's testimony, Erin Kuttner and Mother were called on rebuttal to contest some of the issues raised by Father during his case-in-chief.

Based upon the testimony presented at trial and the exhibits admitted into evidence, the Court applies the custody factors as follows:

1. Which party is more likely to ensure the safety of the child. The Court finds this factor is neutral. The Court accepts the testimony of both parties as credible that they provide a safe environment for Child.

2. Present and past abuse. The Court finds this factor is neutral. The Court accepts the testimony of both parties as credible that they have not committed any abuse.

3. Child abuse and involvement with protective services. The Court would note that there was an investigation performed by Children, Youth & Families concerning alleged abuse by Kellan against Child. Children, Youth & Families did not find any abuse with regards to the allegation.

4. Violent or assaultive behavior committed by a party. The Court finds that this is not a factor in the case. Both parties testified credibly they have not engaged in violent or assaultive behavior.

5. Which party is more likely to

15

encourage and permit frequent and continuing contact between child and the other party. The Court finds this factor is neutral. The Court accepts the testimony of both parties as credible that they permit contact between Child and the other parent. That contact is generally done through routine phone calls.

6. Attempts by a party to turn the child against the other party. The Court finds this factor is neutral. The Court accepts the testimony of both parties as credible that they do not do anything to turn Child against the other parent.

7. The willingness and ability of a party to prioritize the needs of the child by providing appropriate care, stability and continuity for child. The Court finds that this factor is neutral. The Court finds that both parents are fit parents. The Court accepts the testimony of both parties as credible, that they are loving and caring parents who provide for all the Child's needs. In addition, both parties provide a stable environment for child.

8. Need for stability and continuity in child's education, family life and community life. The Court finds this factor is neutral. Both parties are

16

very active in providing for Child's education, particularly given the fact that Child was unable to start kindergarten in a timely fashion due to this custody litigation. The Child is involved in the life of their respective families and Child is involved in the community when they are with each parent.

9. The Child's sibling and other familial relationships. This factor favors Father. The Court finds that the Child has meaningful relationships with his step-sisters as well as his half-sibling Kellan.

10. Well reasoned preference of child. As stated previously, the Child did express a preference to live with Father during the school year. The Court does not find the basis for that to be particularly compelling. The Child is a typical five-year-old and was unable to provide the Court any meaningful basis for his preference.

11. The proximity of residences of the parties. As stated previously, the parties reside three hours and 40 minutes each from each other. Given the distance, it is not practical at this point in time to maintain an equally shared physical custody arrangement during the school year.

17

12. Each party's employment schedule and availability to care for child or ability to make appropriate childcare arrangements. The Court accepts the testimony of both parties as credible that they can either be with Child or that they have other family members who can step in to care for Child when they are unavailable.

13. History of drug or alcohol abuse of a party. The Court finds that this is not a factor in the case given the testimony of the parties.

14. Mental or physical condition of the party. The Court finds that this is not a factor in the case given the testimony of the parties.

With regards to legal custody, the Court does not find any basis to disturb the shared legal custody arrangement between the parties. The Court finds that with regards to matters of Child's health and education, the parties are able to cooperate at least in a reasonable fashion.

As to physical custody, the Court finds that Father shall have majority physical custody during the school year. Mother shall have custody during the school year on an every other weekend basis. The

18

exchange times will be from Friday at 4:00 p.m. until Sundays at 6:00 p.m. The exchange location will continue to be the location in Allentown which the parties have been using for some time now.

During the summer, Mother shall have majority physical custody with her having the first two full weeks of summer. Father will then have the next week. The two weeks on/one week off schedule for Mother will then continue until the end of the summer vacation. Child shall attend Spring Grove Area School District public schools.

As stated at the conclusion of the trial, the Court finds that both parents are fit parents. Nevertheless, the Court is required to make a decision about which parent is to have majority physical custody during the school year. In reaching the decision, the Court considered the following to be of note and import:

1. The Court finds Father's employment situation and financial situation to be more stable.

2. The Court finds that Child has a significant and meaningful relationship with his stepsisters, as well as his half-brother, when he has that opportunity.

19

3. The Court finds that Mother's plan for education for the Child is less sustainable than Father's plan for education for Child.

In addition to the above, the Court Order will order as follows:

1. With regards to the Christmas holiday for 2025 and thereafter, Father will have custody on Christmas Eve and the exchange will then take place on Christmas day at noon. Mother will have custody of Child until the day before school resumes for Child in the Spring Grove Area School District. That exchange will take place at 4:00 p.m. on the day prior to school restarting.

2. Father may take Child to a pediatrician located in York County. That pediatrician shall have a patient portal which will be made available to Mother.

3. The current custody schedule will remain in place until Christmas Eve.

4. The parties are reminded and ordered not to directly or indirectly refer to the other parent or the other parent's family in social media posts.

20

An Order consistent with this Opinion shall be forthcoming.

BY THE COURT:

_____
Michael W. Flannelly,
Judge

slb - 10/31/2025
Case No. 2022-FC-001630-03

21